UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARRELL McCRAY,

Plaintiff,

vs.

WAYNE COUNTY d/b/a WAYNE COUNTY JUVENILE DETENTION FACILITY, SVETLANA KURYANOVA, TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND.

Defendants.

Case No.:
Hon.

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

JAMES J. HARRINGTON, IV (P65351)
GARY N. FELTY, JR. (P55554)
Attorneys for Plaintiff
Fieger, Fieger, Kenney & Harrington, P.C.
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555
Fax: (248) 355-5148
g.felty@fiegerlaw.com

and

RANDALL P. UPSHAW (P43574)
Law Office of Randall P. Upshaw
Co-Counsel for the Plaintiff
17373 W 12 Mile Rd.
Lathrup Village, MI 48076
(248) 569-7776
Fax: (248) 569-1442
rp_upshaw@comcast.net

**PLAINTIFF'S COMPLAINT**

Plaintiff, DARRELL McCRAY, through his attorneys, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., states the following for his Complaint against the above-named defendants:

**INTRODUCTION**

1. Plaintiff DARRELL McCRAY was exposed to horrific conditions while he was a resident inside the former Wayne County Juvenile Detention Facility in Hamtramck, Michigan known as "Dickerson," throughout 2023 and 2024.

2. On April 8, 2024, Juvenile Detention Specialist, Defendant SVETLANA KURYANOVA took DARRELL McCRAY to an off-camera room in an area that she was not allowed to take residents.

3. Once inside the room, Defendant KURYANOVA closed and blocked the door.

4. Defendant KURYANOVA then pulled down DARRELL McCRAY's shorts, got on her knees, and performed fellatio upon him.

5. When DARRELL McCRAY told Juvenile Detention Specialist and supervisor Defendant LAWRENCE JOHNSON what Defendant KURYANOVA had done to him, JOHNSON responded by calling McCRAY a "snitch."

## PARTIES AND VENUE

6. Plaintiff, DARRELL McCRAY, was, at all material times, a resident of Wayne County, Michigan that is located in the Eastern District of Michigan, Southern Division.

7. During the time that is the subject matter of this complaint, Plaintiff DARRELL McCRAY, was a resident of the Wayne County Juvenile Detention Facility known as "Dickerson," where he was housed as both a pretrial detainee and then an adjudicated minor.

8. Defendant WAYNE COUNTY is a political subdivision of the State of Michigan that did, at all material times, own and/or operate the Wayne County Juvenile Detention Facility known as "Dickerson," that was located in the city of Hamtramck, Wayne County, Michigan.

9. Defendant SVETLANA KURYANOVA was at all material times a Juvenile Detention Specialist, employed by Defendant WAYNE COUNTY, who was acting under color of law and in the course of her employment as a Wayne County Juvenile Detention Specialist.

10. Defendant TYRIN ROSEMOND was at all material times a Juvenile Detention Specialist, employed by Defendant WAYNE COUNTY, who was acting under color of law and in the course of her employment as a Wayne County Juvenile Detention Specialist.

11. Defendant RAQUEL PATE was at all material times a Juvenile Detention Specialist, employed by Defendant WAYNE COUNTY, who was acting under color of law and in the course of her employment as a Wayne County Juvenile Detention Specialist.

12. Defendant TAMYRA DICKSON was, at all material times a Juvenile Detention Specialist, employed by Defendant WAYNE COUNTY, who was acting under color of law and in the course of her employment as a Wayne County Juvenile Detention Specialist.

13. Defendant LAWRENCE JOHNSON was at all material times a Juvenile Detention Specialist and supervisor, employed by Defendant WAYNE COUNTY, who was acting under color of law and in the course of his employment with the Wayne County Juvenile Detention Facility.

14. Defendant ANTHONY STRICKLAND was at all material times a Juvenile Detention Specialist and supervisor, employed by Defendant WAYNE COUNTY, who was acting under color of law and

in the course of his employment with the Wayne County Juvenile Detention Facility.

15. Upon information and belief, all defendants reside in and/or do business within the Eastern District of Michigan, Southern Division and did the same at all material times.

16. Venue lies in the Eastern District of Michigan pursuant to 28 U.S.C. §1391(b)(1) and (2).

17. The amount in controversy exceeds Seventy Five Thousand Dollars (>$75,000.00).

## JURISDICTIONAL ALLEGATIONS

18. This is a civil action for monetary damages being brought pursuant to 42 U.S.C. §1983, which guarantees citizens of the United States an action at law against any person who, acting under color of law, deprives them of their rights secured by the United States Constitution.

19. Plaintiff seeks punitive damages for the reckless and callous indifference exhibited by the individual defendants to his constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

20. This Court has original jurisdiction pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343, and supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. §1367.

21. The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

## A. **BACKGROUND FACTS**

22. The family division of the Wayne County Circuit Court has jurisdiction over juvenile proceedings for the violation of municipal ordinances and laws of the state. MCL §712A.1 and §712A.2.

23. Proceedings against juveniles are not criminal proceedings. MCL §712A.1(2).

24. Juvenile proceedings are designed to ensure "that each juvenile coming within the court's jurisdiction receives the care, guidance, and control, preferably in his or her own home, conducive to the juvenile's welfare and the best interest of the state. MCL §712A.1(3).

25. "If a juvenile is removed from the control of his or her parents, the juvenile shall be placed in care as nearly as possible equivalent to the care that should have been given to the juvenile by his or her parents." MCL §712A.1(3).

26. The Court may order a juvenile suspected of violating an ordinance or law to be held in a juvenile detention facility pending hearing and adjudication. MCL §712A.15.

27. A county may establish such a juvenile detention facility provided the facility meets the licensing standards of MCL §722.111 to MCL §722.128, which is known as the Child Care Organizations Act.

28. Such a "secure facility" includes any public or private licensed child caring institution identified by the Michigan Department of Health & Human Services as designed to physically restrict the movements and activities of a minor alleged to have committed a crime or of an adjudicated juvenile. MCL §712A.1(1)(t).

29. The duty to enforce the Child Care Organizations Act and the regulations derived therefrom lies with the Michigan Department of Health & Human Services (MDHHS).

30. Once a juvenile matter is adjudicated, the child, if not released to his or her parents, must be placed into a childcare facility operated by the state or another childcare facility. MCL §712A.18.

31. The State is required to assume responsibility for all children committed to it by the juvenile division of the probate court,

the family division of circuit court, or the court of general criminal jurisdiction under the youth rehabilitation services act. MCL §400.115b.

32. The Charter County of Wayne, through the Wayne County Juvenile and Youth Services Department, at all material times operated the Wayne County Juvenile Detention Facility (JDF) known as "Dickerson," and was required to follow the mandates of the Child Care Organizations Act and all applicable regulations.

33. The JDF was intended to house pre-adjudication detainees until their release to parents or a childcare facility approved by MDHHS.

34. The Social Welfare Act in general and the Childcare Organizations Act (and their related regulations) required the county to perform specific duties that include but are not necessarily limited to all of the following:

a. Comply with the act, childcare institution rules, and the terms of the license for the Wayne County Juvenile Detention Facility,

b. Perform background checks on employees as required by Mich. Admin. Code, R. 400.4112,

c. Provide an appropriate education program as required by Mich. Admin. Code, R. 400.4123,

d. Provide "a sufficient number of administrative, supervisory, social service, direct care, and other staff on duty to perform the prescribed functions required by … [the rules] and to provide for the continual needs, protection, and supervision of residents," Mich. Admin. Code, R. 400.4112,

e. At minimum, provide 1 direct care worker for every 10 residents during waking hours and 1 direct care worker for every 20 residents during sleeping hours, Mich. Admin. Code, R. 400.4126,

f. Perform variable "eye-on" checks of residents in intervals not exceeding fifteen minutes, Mich. Admin. Code, R. 400.4127,

g. Provide recreational activities, Mich. Admin. Code, R. 400.4136,

h. Provide clean linens, pillows, and blankets, Mich. Admin. Code, R. 400.4138,

i. Provide health and dental care,

j. Provide personal care, hygiene, and grooming products to meet the residents' health needs, Mich. Admin. Code, R. 400.4148,

k. Prohibit physical punishment, peer-on-peer discipline, verbal abuse, sexual abuse, sexual harassment and the denial of services, and withholding of food or other services as a form of punishment, Mich. Admin. Code, R. 400.4158,

l. Prohibit the use of seclusion as anything other than a temporary response to prevent injury or harm, Mich. Admin. Code, R. 400.4162,

m. Prohibit the use of seclusion for discipline, punishment, administrative convenience, or staff shortages, Mich. Admin. Code, R. 400.4162,

n. Prohibit lockdowns for anything other than situations posing an immediate threat to the facility, Mich. Admin. Code, R. 400.4165,

o. Maintain the facility in a clean, comfortable, and safe condition, Mich. Admin. Code, R. 400.4407, and,

p. Any other requirements or prohibitions that become known throughout discovery.

35. The Michigan Department of Health and Human Services (MDHHS), through its staff, was charged with the duties of licensing the JDF, overseeing the facility, and monitoring it to ensure that it provided proper care, provided proper education, met detainees' health needs, and protected them.

36. The JDF was designed to be a short-term detention center to house juvenile offenders while awaiting adjudication.

37. Upon adjudication, detainees are supposed to either be released from the facility to their parents or transferred to a state residential treatment facility to receive education, treatment, and counseling.

38. It was, at all material times, the duty of MDHHS to place detainees in residential treatment facilities after adjudication; however, in the matter of DARRELL McCRAY, like many others, the

department did not place the plaintiff following his adjudication and he remained within the custody of the JDF.

39. The JDF had a history of failing to meet the constitutional requirements of providing proper care and protection from harm to its detainees.

40. In that regard, on January 24, 2023, the Wayne County Chief Executive, Warren C. Evans, wrote the governor and advised her that 150 youths were housed at the JDF, when it was only licensed to house 120 or less.

41. Chief Executive Evans further informed the governor that 70 of the detainees were state wards waiting for placement in a state-licensed child-caring institution.

42. The chief executive reported that the JDF was understaffed and overcrowded, placing the detainees at an increased risk of injury.

43. In response to communication from Senior Deputy Director of MDHHS Children's Services Administration, Demetrius Starling, Evans declared the "continuous overpopulation problem at the Wayne County Juvenile Detention Facility" to be an "emergency."

44. Wayne County, at the highest level, knew that overpopulation and understaffing posed an imminent danger to juvenile residents of the facility.

45. The danger was manifested by repeated licensing violations committed by staff members of the JDF:

46. In that regard, JDF Chief Administrator Melissa Fernandez was notified on July 17, 2023, by MDHHS that after an investigation, the department found that JDF staff members physically assaulted a minor resident on or about February 16, 2023, and failed to report their uses of force.

47. The notification further advised the JDF that the physical assault was a repeat violation following other investigations of two separate incidents that occurred on August 22, 2022, and September 14, 2022.

48. Ms. Fernandez was thereafter notified on January 3, 2024, of the results of another MDHHS investigation.

49. The department found that a minor resident was gang-raped by other residents on March 14, 2023.

50. MDHHS found that JDF staff did not provide for the continual needs, protection, and supervision of youth.

51. The investigation specifically concluded that JDF staff failed to maintain line-of-sight supervision of the youth and that staff remained in the control room instead of entering the detention unit when youth left their line of sight or when their view was obstructed.

52. MDHHS also found that JDF staff failed to close and lock unoccupied rooms, failed to intervene when they observed staff being assaulted, that staff failed to perform variable eye-on checks of residents, and that staff members were repeatedly improperly trained and supervised.

53. The violations were documented to be repeat violations as noted in other investigation reports, including but not limited to those authored on August 22, 2022, April 13, 2023, June 5, 2023, and June 20, 2023, involving investigations of other prior events.

54. MDHHS also detailed a myriad of horrific conditions inside the JDF to the county, through Melissa Fernandez, Director of Juvenile Youth Services and license holder for the JDF, on September 29, 2023, following an investigation that occurred after the gang-rape. The findings/violations included:

a. Unclean, unsafe, and unsanitary conditions,

b. Insecure door locking mechanisms,

c. Lack of personal care and hygiene items,

d. Laundry shortage,

e. Inadequate showers,

f. Dirty linens,

g. Inadequate recreation time and services,

h. Excessive solitary confinement,

i. Inadequate dental care and hygiene,

j. Inadequate medical care,

k. Staff shortages,

l. The failure to distribute medications and provide medical treatment,

m. Malnourishment and the denial of food as punishment,

n. Insufficient staff for supervision, intervention in physical altercations, and safety of detainees,

o. Staff failure to leave the control room to observe detainees,

p. Staff failure to monitor detainees,

q. Failure of staff to maintain line of sight of youthful detainees,

r. Failure of staff to intervene to prevent physical attacks, and

s. Failure of staff to perform timely interval checks of youthful detainees.

55. Thereafter, in January 2024, a juvenile resident of the JDF was sexually abused by a worker inside the facility who was employed by MDHHS.

56. The foregoing issues and violations resulted in the formation of Corrective Action Plans (CAPS).

57. In response to the investigations, Melissa Fernandez admitted that the corrective action plans were not being completed.

58. Referring to JDF license holder Ms. Fernandez, MDHHS wrote:

> It is the chief administrator's responsibility for the onsite day-to-day operation of the institution and for ensuring compliance with these rules. The lack of knowledge of the everyday basic needs and lack of knowledge of the non-compliances throughout the facility reveal the lack of involvement she has with Operations Managers, Supervisors, and medical professionals. Administrator 1 has not been inserting herself into her role completely and by her own admission, she has not felt responsible to perform the role or take responsibility for the role. Administrator 1 has selectively chosen the areas she is involved in, CAPS, variances, policies, and procedures, and even meeting with a youth in December 2022, but has not fully accepted the responsibility of the functioning or lack thereof in the facility. CAPS are a part of the chief administrator's role and Administrator 1 reported that she has been looking into those and knows that they are not consistently completed.

59. Because the corrective action plans were not implemented, violations by JDF staff did not cease; rather, MDHHS continued to report violations inside the old and new JDF following investigations to Wayne County, that include but are not limited to the following:

a. Inadequate staff to youth ratio following September 5, 2024, investigation,

b. Failure to maintain line-of-sight and physical abuse by staff of a resident following investigation of September 17, 2024, incident,

c. Inadequate staff, failure to complete incident report, and improper force by staff arising out of September 25, 2024, incident,

d. Failure to complete incident report, failure to train in force/seclusion, failure to perform eye-on checks of residents, and improper force arising out of October 7, 2024, incident,

e. Insufficient staff, failure to radio staff for assistance, and failure to report October 15, 2024, incident,

f. Inappropriate sharing of sexual information by staff members to youths on November 25, 2024 (repeat violation),

g. Failure to report physical management of a resident / failure of supervisor to require and review incident report on December 9, 2024,

h. Insufficient staff / failure to request assistance resulting in physical assault of one resident by another on March 7, 2025,

i. Failure to intervene in physical contact between residents resulting in unconsciousness on March 7, 2025,

j. Physical assault of staff member upon resident on March 18, 2025 (repeat violation),

k. Failure to maintain appropriate staff level and supervise resident known to self-harm on April 1, 2025 (repeat violations),

l. Failing to intervene and participating in physical horseplay of residents on April 29, 2025 (repeat violations),

m. Physical abuse and failure to report incident on May 12, 2025 (repeat violations),

n. Excessive force by staff member against resident on June 12, 2024 (repeat violation),

o. Staff member providing contraband including cannabis to residents on July 7, 2025 (repeat violation),

p. Use of improper restraint on August 21, 2025 (repeat violation),

q. Failure to maintain line of sight resulting in sexual activity between two residents in the shower on August 25, 2025 (repeat violation),

r. Failure to keep line of sight resulting in one resident climbing under the shower stall into another resident's stall on September 22, 2025 (repeat violation),

s. Failure to perform medical assessment following physical altercation on October 6, 2025 (repeat violation),

t. Forceful and unnecessary removal of resident's clothing on October 28, 2025,

u. Excessive force (punching) by staff member on resident on November 5, 2025 (repeat violation),

v. Failure to keep office doors locked on November 26, 2025 (repeat violation),

w. Punching of handcuffed resident and pushing his head toward the ground on December 22, 2025 (repeat violations),

x. Failure to report seclusion of resident on December 30, 2025,

y. Argument over shower time after staff instructed inmate to get out of the shower followed by improper use of force on March 23, 2026 (repeat violation),

z. Use of profanity toward resident and striking him with a handheld radio on March 30, 2026 (repeat violations),

aa. Failing to monitor residents who took medication from medication cart on April 8, 2026 (repeat violation), and

bb. Multiple other incidents that pre-date and post-date the incident at issue.

60. Defendant WAYNE COUNTY had actual knowledge of the horrific conditions inside the JDF before, during, and after the time that Plaintiff DARRELL McCRAY was detained inside of the JDF known as "Dickerson."

61. Before and during the relevant time, juvenile detention specialists customarily failed to document physical abuse by staff members, including physical abuse of a sexual nature.

62. Before and during the relevant time, juvenile detention specialists customarily failed to document improper contact and improper communications between staff members and juvenile residents.

63. Had the improper physical abuse, inappropriate contact, and inappropriate communication been reported, it would have been

investigated, resulting in disciplinary action up to and including termination, in order to prevent future misconduct from occurring.

64. Before and during the relevant time, juvenile detention specialists customarily failed to maintain line-of-sight of JDF residents.

65. Before and during the relevant time, juvenile detention specialists assigned to the control room customarily remained in the control room when they knew that physical abuse was occurring or when they knew that residents were being taken to prohibited areas and failed to intervene by either leaving the control room to intercede or radioing for responsive personnel.

66. Before and during the relevant time, juvenile detention specialists assigned to the control room customarily failed to consistently monitor closed-circuit video of JDF residents and staff.

67. Before and during the relevant time, juvenile detention specialists customarily left unoccupied rooms unlocked and took residents or allowed residents to be taken to prohibited areas that lacked video surveillance.

68. The supervisors and managers of the juvenile detention specialists were aware of these customs or practices but failed to

train their subordinates how to properly monitor residents and how to properly respond to inappropriate behavior.

69. Furthermore, the lack of supervision and discipline of JDF employees was widespread as evidenced by the volume of violations found by MDHHS.

70. Had the juvenile detention specialists consistently monitored closed-circuit video, maintained line of sight, intervened when they observed inappropriate behavior, or radioed for responsive personnel, assaults and inappropriate behavior would have been prevented.

71. As a result of the customs and practices of the JDF, on April 8, 2024, Plaintiff DARRELL McCRAY was taken out of line of sight and into an unlocked room where he was foreseeably sexually abused by juvenile detention specialist, SVETLANA KURYANOVA, who was known to engage in inappropriate relationships with detainees.

72. The abuse was neither isolated nor unknown to the defendants.

73. Defendant SVETLANA KURYANOVA was known by the defendants to engage in inappropriate sexual and grooming behavior

with minor detainees prior to her sexual contact with DARRELL McCRAY on April 8, 2024, that included but was not limited to:

a. Holding their hands,

b. Hugging them,

c. Kissing them,

d. Taking them to unauthorized and off-camera locations,

e. Exposing her breasts to them,

f. Buying them candy,

g. Providing them with personal information,

h. Feigning availability for emotional support,

i. Seeking sympathy for her own personal issues,

j. Sharing nude photos with them,

k. Giving them her personal phone number,

l. Inviting detainees to stay with her upon release, and,

m. Any other inappropriate behavior that becomes known throughout the course of discovery.

74. In that regard, Defendant ANTHONY STRICKLAND, who was one of Defendant KURYANOVA's supervisors on the day that the plaintiff was abused, told investigating officers that he had spoken to Defendant KURYANOVA about her professionalism and interactions with residents prior to the abuse of Plaintiff DARRELL McCRAY.

75. Upon information and belief, rather than being terminated from employment, Defendant KURYANOVA was re-assigned from one pod of the facility to another, which placed her in the position to abuse Mr. McCray.

76. Furthermore, on Sunday, April 7, 2024, the day before the sexual abuse of the plaintiff occurred, Defendant, TYRIN ROSEMOND, observed Defendant KURYANOVA sitting with a minor resident holding his hand.

77. Defendant ROSEMOND also observed the minor place his hands between Defendant KURYANOVA's thighs.

78. Defendant ROSEMOND did not intervene or report the inappropriate contact to her superiors before DARRELL McCRAY was abused.

79. According to Defendant ROSEMOND's statement to investigating police officers, she was never trained on how to report such misconduct.

## B. FACTUAL ALLEGATIONS PERTAINING TO PLAINTIFF DARRELL McCRAY's DETENTION

80. Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

81. Plaintiff, DARRELL McCRAY, was initially admitted to the Wayne County Juvenile Detention Facility known as "Dickerson," on or about March 13, 2023, on petition before adjudication and released to the custody of his mother on or about March 23, 2023.

82. Plaintiff, DARRELL McCRAY, was thereafter admitted to the Wayne County Juvenile Detention Facility known as "Dickerson," on petition before adjudication on or about June 2, 2023.

83. Plaintiff's matter was adjudicated on or about July 7, 2023, and he was ordered to be referred to non-secure placement.

84. Plaintiff DARRELL McCRAY was not referred for non-secure placement but remained in the JDF for over one year until he was released on approximately June 13, 2024.

85. During the course of his detention, Plaintiff DARRELL McCRAY suffered cruel, unusual, and inhumane treatment that included:

a. Prolonged seclusion,

b. Deprivation of education and mental health treatment,

c. Inadequate or insufficient clothing,

d. Inadequate implements of dental hygiene,

e. Physical abuse from other residents,

f. Inadequate nourishment, including being served spoiled or inedible food and drink,

g. Inadequate implements of general hygiene and denial of the ability to shower for prolonged periods of time,

h. Exposure to sexual harassment and conduct,

i. Sexual abuse by an employee of the facility, and

j. Other deprivations that become known throughout the course of discovery.

86. The sexual abuse was committed by Defendant SVETLANA KURYANOVA, while she was working under color of law and in the scope of her employment as a Juvenile Detention Specialist at the JDF known as "Dickerson" on April 8, 2024.

87. Defendant SVETLANA KURYANOVA was assigned to pod E3 on that date and was working the afternoon shift from 3:00 p.m. to 11:00 p.m.

88. Defendant RAQUEL PATE was assigned to work with Defendant KURYANOVA.

89. Defendant PATE observed Defendant KURYANOVA holding hands with a resident and hugging a resident before DARRELL McCRAY was abused.

90. Defendant PATE observed Defendant KURYANOVA take residents, including DARRELL McCRAY, to an office area where residents were not allowed to be taken, before McCRAY was abused.

91. Defendant PATE did not intervene or advise supervisors of the inappropriate conduct that she observed before DARRELL McCRAY was abused.

92. Defendant TYRIN ROSEMOND saw Defendant KURYANOVA holding hands with a resident on April 7, 2024.

93. Defendant TYRIN ROSEMOND saw the resident place his hands between Defendant KURYANOVA's thighs on April 7, 2024.

94. Defendant ROSEMOND did not advise supervisors of the inappropriate conduct that she observed before DARRELL McCRAY was abused.

95. Defendant ROSEMOND was working with Defendant KURYANOVA on April 8, 2024.

96. Defendant ROSEMOND observed Defendant KURYANOVA escort residents, including DARRELL McCRAY, to an office area

where residents were not allowed to be taken, before McCRAY was abused.

97. Defendant ROSEMOND did not advise supervisors of the inappropriate conduct that she observed before DARRELL McCRAY was abused.

98. Defendant ROSEMOND was not trained how to report misconduct of colleagues to supervisors.

99. Defendant TAMYRA DICKSON was assigned to the control room of the facility on the same shift as Defendant KURYANOVA on the date KURYANOVA sexually abused DARRELL McCRAY.

100. Defendant DICKSON was responsible for monitoring CCTV at the facility.

101. Defendant DICKSON observed via video what Defendants PATE and ROSEMOND personally observed.

102. Defendant DICKSON first observed Defendant KURYANOVA holding hands with a resident.

103. Defendant DICKSON did not leave the control room to investigate or intervene.

104. Defendant DICKSON advised her supervisors, Defendants LAWRENCE JOHNSON and ANTHONY STRICKLAND, what she saw.

105. Defendant JOHNSON did not respond to the control room for 40 minutes and did not investigate or intervene to prevent further misconduct.

106. Defendant JOHNSON reported that inappropriate handholding to his supervisor, Operations Manager Kimberly Heard, the following day.

107. Defendant STRICKLAND was aware of prior inappropriate contact between Defendant KURYANOVA and residents.

108. Defendant STRICKLAND did not respond by investigating or intervening to prevent further misconduct.

109. Defendant Dickson thereafter observed via video Defendant KURYANOVA taking residents to the office area where residents were not allowed to be taken.

110. Defendant DICKSON did not leave the control room to investigate or intervene.

111. Plaintiff DARRELL McCRAY was thereafter sexually abused by Defendant KURYANOVA.

112. Deputies of the Wayne County Sheriff's Department investigated the misconduct, and Defendant KURYANOVA was charged with two counts of second-degree criminal sexual conduct

involving county prisoners, one of which related to the fellatio forced upon Plaintiff DARRELL McCRAY.

113. Defendant KURYANOVA was convicted of the charges on June 17, 2025, and sentenced to 71 months to 15 years in prison on July 2, 2025.

## C. **LEGAL FRAMEWORK**

### 1. Right of Action

114. Citizens such as the plaintiff have a right to bring an action against governments and governmental employees for the violation of their rights.

> "Every person who, under color of any statute, ordinance, regulation, custom or usage of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. §1983.

115. The Eighth Amendment to the United States Constitution prohibits inhumane incarceration.

116. It has been interpreted to prevent any punishment that violates civilized standards of decency or reflects unnecessary and wanton infliction of pain requiring prison officials to provide adequate

food, clothing, shelter, and medical care; and, to undertake reasonable measures to guarantee the safety of inmates.

117. Sexually abusing a detainee is an Eighth Amendment violation.

118. Furthermore, prison officials have a constitutional duty to protect prisoners from the violence of other inmates and from correctional staff.

119. Under the Eighth Amendment, a prison official is liable for failing to protect an inmate where the inmate was exposed to a condition that objectively posed a substantial risk of serious harm and the prison official was deliberately indifferent to the safety need.

120. It has been held under the Eighth Amendment that a corrections officer is deliberately indifferent where the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the official drew the inference but failed to take reasonable measures to prevent the harm.

121. The Eighth Amendment applies to the states and its political subdivisions by virtue of the Fourteenth Amendment.

122. Courts across the country have found juvenile detainees to be entitled to increased protections from inhumane treatment

because there is a broad consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults and the purpose of youthful detention is rehabilitation and not punishment.

123. The Fourteenth Amendment to the United States Constitution provides, in material part, that "no State [or subdivision of the state] shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State [or subdivision of the state] deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

124. As it relates to the use of force, including sexual abuse, the standard for liability under the Fourteenth Amendment is purely objective and detention workers are liable if force that was purposefully or knowingly used against a detainee was objectively unreasonable.

125. It is clearly established that sexual assault by a corrections' officer is an objectively serious constitutional violation under the the Eighth and the Fourteenth Amendments.

126. It is clearly established that ignoring known risks of harm to a detainee due to inadequate medical care or inhumane conditions of confinement constitutes deliberate indifference.

## COUNT I—EIGHTH AND FOURTEENTH AMENDMENT VIOLATION – SVETLANA KURYANOVA

127. Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

128. Plaintiff, DARRELL McCRAY, was, at all material times, a youthful detainee at the Wayne County Juvenile Detention Facility.

129. Defendant SVETLANA KURYANOVA, was at all material times, an agent or employee of Wayne County who was employed as a juvenile detention specialist and was acting under color of law and within the scope of her employment.

130. Plaintiff DARRELL McCRAY had a clearly established Eighth and Fourteenth Amendment right to be free of conditions or restrictions of detention that amounted to punishment.

131. Plaintiff DARRELL McCRAY's rights included the right to be free from sexual abuse by juvenile detention specialists.

132. Federal courts have long held that sexual abuse is sufficiently serious to violate the Eighth and Fourteenth Amendments whether the abuse is perpetrated by other inmates or guards.

133. As a juvenile detainee, Plaintiff DARRELL McCRAY is protected by the Fourteenth Amendment's right to be free from excessive force, including sexual abuse.

134. Defendant SVETLANA KURYANOVA, violated Plaintiff DARRELL McCRAY's right to be free from sexual abuse when she grabbed him by the arm and took him to a conference room or office, closed and blocked the door, pulled down his shorts, got on her knees, and began performing fellatio upon him.

135. Defendant KURYANOVA's actions were not accidental, but rather were purposeful, knowing, and reckless.

136. Defendant KURYANOVA's actions were objectively unreasonable.

137. Defendant SVETLANA KURYANOVA's actions were without consent, were reckless, and were in callous disregard to plaintiff's rights.

138. Inmates, particularly minors, are regarded as unable to consent to sexual relations with prison staff.

139. Defendant SVETLANA KURYANOVA used her power and position to force the sexual abuse upon plaintiff and used intimidation as a tactic for compliance and to dissuade DARRELL McCRAY from reporting the abuse.

140. Defendant KURYANOVA's actions also amounted to the infliction of cruel and unusual punishment.

141. It was clearly established at the time of Defendant SVETLANA KURYANOVA's abuse of plaintiff that the performance of sexual acts by a corrections officer upon a detainee was likely to cause serious harm or injury.

142. Defendant SVETLANA KURYANOVA knew that performing sexual acts upon Plaintiff DARRELL McCRAY would cause him to suffer serious injury.

143. Defendant SVETLANA KURYANOVA's actions were reckless and in the face of an unjustifiably high risk of harm that was known to her.

144. It was clearly established at the time of Defendant SVETLANA KURYANOVA's abuse of plaintiff that the performance of

sexual acts by a corrections officer upon a detainee demonstrates malice.

145. Defendant SVETLANA KURYANOVA, maliciously and sadistically sexually abused Plaintiff DARRELL McCRAY.

146. Defendant SVETLANA KURYANOVA had no justifiable reason for performing sexual acts upon plaintiff and the sexual abuse was for no reason other than to intentionally punish, harm, injure, and/or humiliate Plaintiff DARRELL McCRAY.

147. Defendant SVETLANA KURYANOVA knew that her actions were unconstitutional as evidenced by the fact that she took the plaintiff to an area that was not monitored by video cameras, closed the plaintiff into a private room, and instructed plaintiff not to tell other corrections staff what had transpired.

148. Plaintiff DARRELL McCRAY suffered injury and damage as a direct and proximate result of Defendant SVETLANA KURYANOVA's violation of his constitutional rights in the past, at the present, and will continue to suffer those injuries and damages into the future.

149. Plaintiff DARRELL McCRAY's injuries and damages, past, present, and future include but are not limited to the following:

a. Nonconsensual and unconstitutional sexual and physical violation,

b. Unwanted and unconstitutional touching made against his will,

c. Unconstitutional restriction of his movement,

d. Physical pain and suffering,

e. Mental anguish,

f. Fright and shock,

g. Embarrassment, humiliation, and mortification,

h. Expenses for past, present, and future medical and/or mental health treatment,

i. Any other damages or injuries discovered throughout litigation.

150. Plaintiff is entitled to punitive damages for Defendant SVETLANA KURYANOVA's callous indifference to his constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

***WHEREFORE***, Plaintiff, DARRELL McCRAY, respectfully requests that this Honorable Court enter judgment in his favor and against Defendant SVETLANA KURYANOVA in an amount in excess of Seventy-five thousand dollars (>$75,000.00) plus costs, interest, attorney fees, expert fees, punitive damages, and any additional costs, damages, or fees that are allowable.

## COUNT II – FAILURE TO PROTECT – TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, AND ANTHONY STRICKLAND

151. Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

152. Defendants TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND, each owed a constitutional duty under the Eighth and Fourteenth Amendments to the United States Constitution to Plaintiff DARRELL McCRAY to protect him from the sexual abuse of Defendant SVETLANA KURYANOVA.

153. The risk of a sexual assault is an objectively, sufficiently serious harm to require protection under the Eighth and Fourteenth Amendments and the right to be free from deliberate indifference to assault and sexual abuse is clearly established.

154. Defendants TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND had actual knowledge that Defendant SVETLANA KURYANOVA posed an excessive risk to Plaintiff DARRELL McCRAY's safety and disregarded the risk.

155. Defendants TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND knew that Defendant SVETLANA KURYANOVA had a history of engaging in grooming behavior upon juvenile inmates of the Wayne County Juvenile Detention Facility prior to her performing sexual acts upon Plaintiff DARRELL McCRAY on or about April 8, 2024, that included, but were not necessarily limited to:

a. Taking them to areas that were not monitored by video CCTV,

b. Providing them contraband,

c. Entering and remaining in their rooms,

d. Confiding with them about personal stories,

e. Obtaining personal and intimate information from them,

f. Sharing nude photos with them,

g. Exposing her breasts to them,

h. Engaging in inappropriate physical contact and touching, and,

i. Other acts that become known throughout discovery.

156. Defendants TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND had direct knowledge of Defendant SVETLANA

KURYANOVA engaging in such behavior before she sexually abused DARRELL McCRAY, on April 8, 2024.

157. Defendants TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND all had an opportunity to intervene to protect Plaintiff DARRELL McCRAY from the risk of serious harm by relieving Defendant SVETLANA KURYANOVA of her duties, giving her instruction, monitoring her continued activities, reporting her to deputies assigned to the jail, or taking other action to prevent the sexual abuse from occurring.

158. Defendants TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND intentionally and not accidentally, failed to intervene by relieving Defendant SVETLANA KURYANOVA of her duties, giving her instruction, monitoring her continued activities, reporting her to deputies assigned to the jail, or taking other action to prevent the sexual abuse from occurring.

159. Plaintiff DARRELL McCRAY was exposed to the substantial risk of harm of being sexually abused by Defendant SVETLANA KURYANOVA because of the inactions of Defendants

TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND.

160. As a consequence of the deliberate indifference of Defendants TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND, Plaintiff DARRELL McCRAY was grabbed by Defendant SVETLANA KURYANOVA and taken to an unmonitored room where he was sexually abused.

161. Defendants TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND all had the means to observe Plaintiff DARRELL McCRAY being taken to an unmonitored area and the means to intervene, but they failed to act.

162. Defendants TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND's failure to intervene to protect Plaintiff DARRELL McCRAY caused the foreseeable sexual abuse to occur and him to suffer injuries and damages.

163. Plaintiff DARRELL McCRAY reported the sexual assault and Defendant LAWRENCE JOHNSON called him a "snitch" and identified Plaintiff DARRELL McCRAY as such to other detainees.

164. Being identified as a snitch has been recognized as a label that puts a detainee at substantial risk of assault.

165. Defendant JOHNSON was aware that his act of labeling Plaintiff DARRELL McCRAY a snitch would place him at substantial risk of assault.

166. Plaintiff DARRELL McCRAY was assaulted by other detainees as a direct and proximate result of being labeled a "snitch" by Defendant JOHNSON.

167. Plaintiff DARRELL McCRAY suffered injury and damage as a direct and proximate result of Defendants TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND's violation of his constitutional rights, in the past, at the present, and will continue to suffer those injuries and damages into the future.

168. Plaintiff DARRELL McCRAY's injuries and damages, past, present, and future include the following:

a. Nonconsensual and unconstitutional sexual and physical violation,

b. Unwanted and unconstitutional touching made against his will,

c. Unconstitutional restriction of his movement,

d. Physical pain and suffering,

e. Mental anguish,

f. Fright and shock,

g. Embarrassment, humiliation, and mortification,

h. Expenses for past, present, and future medical and/or mental health treatment,

i. Any other damages or injuries discovered throughout litigation.

169. Plaintiff is entitled to punitive damages for Defendants TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND's callous indifference to his constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

WHEREFORE, Plaintiff, DARRELL McCRAY, respectfully requests that this Honorable Court enter judgment in his favor and against Defendants TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY

STRICKLAND in an amount in excess of Seventy-five thousand dollars (>$75,000.00) plus costs, interest, attorney fees, expert fees, punitive damages, and any additional costs, damages, or fees that are allowable.

**COUNT III -- MONELL LIABILITY – DEFENDANT WAYNE COUNTY**

170. Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

171. Defendants SVETLANA KURYANOVA, TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND violated Plaintiff DARRELL McCRAY's constitutional rights as alleged herein.

172. Defendant WAYNE COUNTY owed the plaintiff a duty to protect him from physical assault under the Eighth and Fourteenth Amendments to the United States Constitution, including sexual assault by a corrections officer.

A. Maintenance of Unconstitutional Customs

173. There existed a clear, widespread, and persistent pattern inside the Wayne County Juvenile Detention Facility of being over-populated and understaffed that prevented juvenile detention

specialists from timely protecting juvenile residents from physical assaults.

174. There also existed a clear, widespread, and persistent pattern inside the Wayne County Juvenile Detention Facility of Juvenile Detention Specialists:

a. Having inappropriate physical contact with juvenile residents,

b. Failing to maintain line of sight supervision of residents resulting in unwitnessed physical attacks,

c. Remaining inside the control room during physical attacks instead of intervening to prevent physical attacks to protect juvenile residents,

d. Taking juvenile residents into restricted, off-camera areas, where they were not allowed to take residents,

e. Observing employees taking juvenile residents into restricted, off-camera areas, where they were not allowed to take residents,

f. Permitting other juvenile detention specialists to take residents to unmonitored areas,

g. Leaving doors to restricted and unmonitored areas open and unlocked,

h. Failing to promptly respond to assaults upon residents,

i. Failing to timely report abuse or inappropriate conduct of employees, and

j. Any other customs or policies that become known throughout discovery.

175. Defendant WAYNE COUNTY's policy makers had actual or constructive knowledge of the persistent pattern of misconduct.

176. Defendant WAYNE COUNTY's policy makers tacitly approved or acquiesced to the misconduct by failing to take corrective action and failing to implement CAPS mandated by MDHHS.

177. Defendant WAYNE COUNTY's failure to act amounted to an official policy of inaction reflecting deliberate indifference to the safety and constitutional rights of juvenile residents.

178. Defendant WAYNE COUNTY's custom of inaction was the moving force behind the sexual assault of Plaintiff DARRELL McCRAY.

179. Plaintiff, DARRELL McCRAY was sexually assaulted as a direct and proximate result of Defendant WAYNE COUNTY's failure to act.

B. Failure to Train or Supervise

180. Defendant WAYNE COUNTY's training and supervision of its juvenile detention specialists was inadequate to prevent the physical and sexual abuse of juvenile residents.

181. Defendant WAYNE COUNTY failed to implement CAPS mandated by MDHHS or otherwise act to prevent physical and sexual

abuse of its juvenile residents despite a known history or pattern of similar misconduct within the JDF.

182. The known history of misconduct is evidenced by reports of MDHHS that include but are not limited to the following findings:

a. Physical assault of a juvenile detainee by staff on or about February 16, 2023, documented to be a repeat violation,

b. July 17, 2023, report that juvenile detention specialists repeatedly failed to document their use of force upon juvenile residents,

c. Gang rape of juvenile resident on March 14, 2023, due to failure to maintain line of sight and failure to intervene by juvenile detention specialists,

d. Findings of MDHHS of a history of failure of juvenile detention specialists to leave the control room to investigate or intervene when juvenile residents were out of sight,

e. Findings on September 29, 2023, of staff shortages, failure to intervene during physical altercations, failure to monitor residents, failure to leave the control room, failure to maintain line of sight,

f. January 2024 sexual abuse of juvenile residents by MDHHS employee assigned to the JDF,

g. Subsequent investigations of MDHHS finding repeat violations associated with physical assaults by juvenile detention specialists upon residents, the failure to report assaults by juvenile detention specialists, the failure to intervene, the failure to monitor, the failure to leave the control room, the failure to maintain line of sight,

h. MDHHS conclusions that juvenile detention specialists were not properly trained or supervised, and

i. Any other misconduct that becomes known throughout the course of discovery.

183. Defendant WAYNE COUNTY policymakers had actual knowledge of the misconduct as evidenced by the chief executive acknowledging that the juvenile residents were at an increased danger of injury and the director being advised that she had failed to implement CAPS.

184. Even without the prior pattern, the need for more or different training regarding reporting misconduct by juvenile detention specialists, intervening to prevent physical assaults, appropriate and inappropriate contact between staff and residents, maintaining line of sight, and leaving the control room to monitor residents and staff was so patently obvious that the failure to provide it was highly likely to result in a violation of constitutional rights including another sexual assault upon a resident, such as plaintiff.

185. Defendant WAYNE COUNTY's failure to act amounted to an official policy of inaction reflecting deliberate indifference to the safety and constitutional rights of juvenile residents.

186. Defendant WAYNE COUNTY's custom of inaction was the moving force behind the sexual assault of Plaintiff DARRELL McCRAY.

187. Plaintiff, DARRELL McCRAY was sexually assaulted as a direct and proximate result of Defendant WAYNE COUNTY's failure to act.

188. Plaintiff DARRELL McCRAY's injuries and damages, past, present, and future include the following:

a. Nonconsensual and unconstitutional sexual and physical violation,

b. Unwanted and unconstitutional touching made against his will,

c. Unconstitutional restriction of his movement,

d. Physical pain and suffering,

e. Mental anguish,

f. Fright and shock,

g. Embarrassment, humiliation, and mortification,

h. Expenses for past, present, and future medical and/or mental health treatment,

i. Any other damages or injuries discovered throughout litigation.

WHEREFORE, Plaintiff, DARRELL McCRAY, respectfully requests that this Honorable Court enter judgment in his favor and

against Defendant WAYNE COUNTY in an amount in excess of Seventy-five thousand dollars (>$75,000.00) plus costs, interest, attorney fees, expert fees, and any additional costs, damages, or fees that are allowable.

## COUNT IV – SEXUAL ASSAULT & BATTERY – SVETLANA KURYANOVA

189. Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

190. Defendant SVETLANA KURYANOVA, while employed as a juvenile detention specialist by Wayne County, willfully and intentionally sexually battered Plaintiff DARRELL McCRAY, by grabbing his arm, taking him into an unmonitored room, pulling down his pants, and performing fellatio upon him on or about April 8, 2024.

191. The sexual battery was unwelcome, unlawful, unjustified, and was against Plaintiff DARRELL McCRAY's will and instead was accomplished by actual or apparent coercion, abuse of power, and abuse of authority.

192. Defendant SVETLANA KURYANOVA's actions were undertaken with such indifference to whether harm would result such that they were undertaken with malice or bad faith.

193. Plaintiff DARRELL McCRAY suffered injury and damages as a direct and proximate result of the actions of Defendant SVETLANA KURYANOVA.

194. Plaintiff DARRELL McCRAY's injuries and damages, past, present, and future include the following:

a. Nonconsensual and unconstitutional sexual and physical violation,
b. Unwanted and unconstitutional touching made against his will,
c. Unconstitutional restriction of his movement,
d. Physical pain and suffering,
e. Mental anguish,
f. Fright and shock,
g. Embarrassment, humiliation, and mortification,
h. Expenses for past, present, and future medical and/or mental health treatment,
i. Any other damages or injuries discovered throughout litigation.

WHEREFORE, Plaintiff, DARRELL McCRAY, respectfully requests that this Honorable Court enter judgment in his favor and

against Defendant SVETLANA KURYANOVA in an amount in excess of Seventy-five thousand dollars (>$75,000.00) plus costs, interest, attorney fees, expert fees, punitive damages, and any additional costs, damages, or fees that are allowable.

Respectfully submitted,

*/s/ Gary N. Felty, Jr.*

GARY N. FELTY, JR. (P55554)
Fieger, Fieger, Kenney & Harrington, P.C.
Attorney for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan 48075
(248) 355-5555
g.felty@fiegerlaw.com

Dated: 11/5/2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARRELL McCRAY,

Plaintiff,

vs.

WAYNE COUNTY d/b/a WAYNE COUNTY JUVENILE DETENTION FACILITY, SVETLANA KURYANOVA, TYRIN ROSEMOND, TAMYRA DICKSON, RAQUEL PATE, LAWRENCE JOHNSON, and ANTHONY STRICKLAND.

Defendants.

Case No.:
Hon.

**JURY DEMAND**

JAMES J. HARRINGTON, IV (P65351)
GARY N. FELTY, JR. (P55554)
Attorneys for Plaintiff
Fieger, Fieger, Kenney & Harrington, P.C.
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555
Fax: (248) 355-5148
g.felty@fiegerlaw.com

and

RANDALL P. UPSHAW (P43574)
Law Office of Randall P. Upshaw
Co-Counsel for the Plaintiff
17373 W 12 Mile Rd.
Lathrup Village, MI 48076
(248) 569-7776
Fax: (248) 569-1442
rp_upshaw@comcast.net

## **JURY DEMAND**

Plaintiff, DARRELL McCRAY, through his attorneys, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., hereby demands a trial by jury.

Respectfully submitted,

*/s/ Gary N. Felty, Jr.*
GARY N. FELTY, JR. (P55554)
Fieger, Fieger, Kenney & Harrington, P.C.
Attorney for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan 48075
(248) 355-5555
g.felty@fiegerlaw.com

Dated: 11/5/2026